**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-6616**

———————

RODNEY A. KOON

        Plaintiff-Appellant,

    v.

STATE OF NORTH CAROLINA; BRIAN K. WELLS; DIANE K. BROWNING

        Defendants-Appellees.

———————

Appeal from the United States District Court for the Eastern District of North Carolina at Raleigh.  Louise W. Flanagan, U.S. District Judge.  (5:16-ct-03301-FL)

———————

Argued:  January 26, 2022                    Decided:  October 5, 2022

———————

Before WILKINSON, WYNN, and RICHARDSON, Circuit Judges.

———————

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Wilkinson joined.  Judge Wynn wrote a separate opinion concurring in part and dissenting in part.

———————

**ARGUED:**  Danielle Rebecca Feuer, O'MELVENY & MYERS LLP, Los Angeles, California, for Appellant.  Alex Ryan Williams, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.  **ON BRIEF:**  Samuel S. Weiss, RIGHTS BEHIND BARS, Washington, D.C.; Sabrina S. Strong, Los Angeles, California, Kendall Turner, O'MELVENY & MYERS LLP, Washington, D.C., for Appellant.  Joshua

H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

RICHARDSON, Circuit Judge:

Rodney Koon is a disabled prisoner who walks with a cane, yet he was denied a handicap pass to access the first-floor library for seven months. Because of that denial, Koon was forced to climb two flights of stairs to get to the general-population library. Koon says that this exertion caused him serious pain, made his old injuries worse, and caused him new injuries. While Koon eventually got his handicap pass, he now wants damages for the pain, injuries, and suffering that were caused by that seven-month delay. But under the Americans with Disabilities Act, plaintiffs can only get compensatory damages for intentional discrimination. What showing that requires is an open question in this circuit, but it at least requires deliberate indifference to the prisoner's federally protected rights. Because Koon has failed to establish deliberate indifference, the district court was right to grant summary judgment to the State of North Carolina, and we affirm.

## I.    Background

Rodney Koon is a state prisoner in North Carolina. Koon caused a fatal car accident while high on drugs and pleaded guilty to two counts of felony death by vehicle and one count of involuntary manslaughter. The same accident that put him in jail also caused his disabling injuries, which have plagued him for years afterward with chronic pain in his hips, his right knee, and his left ankle. They have required surgery and physical therapy, and they still force Koon to walk with a cane, sometimes even requiring a wheelchair for long distances. And the pain gets worse the more he is forced to walk. Given these injuries, North Carolina acknowledges that Koon has a disability and treats him as an "ADA assigned" inmate.

3

Koon was briefly treated at the healthcare complex at Central Prison early in his incarceration. He was then housed at Lanesboro Correctional. As soon as he got to Lanesboro, Koon asked for an accommodation for his disability. J.A. 41 ("I'm not able to go up and down steps without difficulty . . . ."). He was assessed to determine what accommodations, if any, might be required. In that initial evaluation, Koon was granted limitations on certain activities and other modifications based on his injuries. He was given a cane and a bottom bunk. He received a lifting limitation of 25 pounds. He was excused from performing tasks requiring pushing or pulling, and importantly for this case, climbing. The amount of climbing he was allowed "under the ADA" was strict: "none." J.A. 42–43. The evaluation listed his limitations as "[c]onsiderable" and his condition as "[p]ermanent." *Id.* Koon did not, however, seek a "handicap pass" at Lanesboro. A handicap pass is different from ADA status and allows a prisoner access to certain areas that are otherwise off limits, places like a handicap library. Koon says that he never applied for a handicap pass at Lanesboro because he didn't need one. According to Koon, he could access everything he needed at Lanesboro, including the library, without ever having to climb or take "even one step." J.A. 88.

A few years later, Koon was transferred to Pender Correctional. He arrived in March. Once there, he realized that the general-population prison library was up two flights of stairs (17 stairs in total), and that made it difficult and painful for him to use the library. There was a handicap library at Pender that was accessible without using the stairs, but it required a handicap pass. Having never pursued a pass while at Lanesboro, Koon set about trying to get one.

4

About two weeks after arriving, Koon submitted an inmate request form to his case manager. "I am an ADA assigned inmate . . . and I'm going on my third week at Pender C.I. and I have not been able to attend the library . . . . Why do I not have a [handicap] pass . . . already?" J.A. 125. Then, during an April sick call, Koon brought up his issues accessing the library with the medical staff. *See* J.A. 167. The nurse on that sick call saw his swollen knee, saw his climbing restriction, confirmed the climbing restriction on the computer, but still refused to give him a handicap pass. According to Koon, the nurse said that "without a Pender Prison handicap pass/card," Koon "would just have to keep going/using the Pender regulator population library, which is up seventeen (17) steps!" J.A. 168.

But that nurse would not have been able to provide the handicap pass, even if she decided that Koon needed one. At Pender, getting a pass only starts with a sick-call request and an initial nursing evaluation. From there, a request must be made to a medical provider (a doctor or a nurse practitioner) to make another evaluation—though, it needn't be face-to-face. *See* J.A. 52 (noting that a medical provider must approve a handicap pass "after evaluating the inmate and/or reviewing his medical records"). The handicap pass could be given only after that second evaluation.

Koon kept trying though. He submitted three more sick-call requests that spring and into summer, in April, May, and June. While they were not all focused on the handicap pass, each of those requests to some extent asked for a pass to access the handicap library. In June, all this led to a review of his records by the medical staff who could provide the pass he wanted.

5

The request went to Nurse Practitioner Diane Browning. There's some evidence that Browning had recently been thrust into her position by the sudden death of a superior, and that because of her inexperience, she wasn't fully comfortable with all the processes and systems required to do the job. When Koon's request for a handicap pass came across Browning's desk, it appeared in the computer system as a request for a *renewed* handicap pass. All handicap passes have expiration dates, so renewals were required from time to time. It's not clear from the record how the request got entered in the system as a renewed pass rather than for an initial pass. But Browning was unaware that anything was off, so she treated it like any other request for a renewed pass. She reviewed Koon's medical records and saw that he had been assessed at Lanesboro and that no handicap pass was issued there. Since Koon had never been granted a handicap pass in the North Carolina prison system, she denied his request for a renewed handicap pass. She did not meet with Koon or examine him, nor did she look at the prison database that listed inmates' medical restrictions;[1] she felt she didn't need to. *See* J.A. 53; *see also* Appellant's Br. 30–31. Browning did not know that Koon had submitted multiple sick-call requests, nor that Koon was an ADA prisoner with a climbing restriction. In her declaration, she admits that if she were aware of those details, she would have approved the request for a handicap pass. And

---

[1] The record is not a model of clarity, but it appears that medical records are kept in a separate place from the prison database which lists a prisoner's restrictions, like the 25-pound lifting restriction or the no-climbing restriction. Browning says—and Koon appears to concede, *see* Appellant's Br. 30–31—that she only looked at Koon's medical records *and not* at the database listing the restrictions. With that in mind, she would have known that Koon "should use [a] cane for short distances and [a] wheelchair for long distances," J.A. 58, and that Koon experienced pain and inflammation in his knee, hips, and ankle. But there is no evidence she knew he had a climbing restriction.

while there is some evidence that she knew of Koon and had seen him walking around the facility—meaning she may have known he walked with a cane—walking with a cane does not automatically entitle you to a handicap pass.

After being denied, Koon submitted an administrative grievance. The prison responded to that grievance in July, after a staff investigator went over it, suggesting that a handicap pass wasn't medically necessary and that even though he walked with a cane, he could access the library for the general population. Koon appealed, and Bryan Wells, prison administrator and a Defendant here, confirmed the denial, telling Koon in writing that "staff has adequately responded to your complaint." J.A. 48. And Koon's final administrative remedy was denied in late August. "From this review, it appears that staff has adequately addressed this inmate's grievance concerns." J.A. 49.

During the time he filed all these formal requests, Koon was informally asking for help from anyone who would listen. Koon says that he stopped a prison official called CPT Harris two times in April and asked him for help. J.A. 46 ("[H]e wrote my name down each time."). Koon says he spoke to a Captain Hunt in April and asked for his help with the problem, though the circumstances of those meetings aren't clear from the record. In June, Koon spoke to Bryan Wells in person about the issue, and then sent a letter to Wells before following up with a grievance report. During a meeting with a chronic-disease nurse about unrelated medical issues, he again brought up the issue. And he met with and discussed the issue with his case manager Mr. Shelton in September. From all that came nothing, at least until the fall.

7

Koon finally got a handicap pass in October, during a sick call with Dr. Joseph Maides. According to Koon, Dr. Maides was new at Pender, and when he looked at Koon's record—in other words, when he looked at everything that Browning was supposed to look at—he immediately issued the pass. But even with the pass, Koon says the damage was already done when he was forced to walk to the library up two flights of stairs from March to October.

Koon filed this pro se civil suit seeking compensatory damages for the aggravated injuries to his legs. Koon claims that he worsened his injuries during the time he spent going up and down the 17 steps to the general-population library, causing swelling in his bad knee, hurting his good leg through over-compensation, and causing serious pain.

The district court granted summary judgment to North Carolina on Koon's ADA claims because "the record reflects that defendant Browning's denial of plaintiff's request to renew a handicap pass implicates, at most, negligence on defendant Browning's part, and the ADA does not provide a remedy for negligence." *Koon v. North Carolina*, 5:16-CT-3301-FL, 2021 WL 1206579, at *5 (E.D.N.C. Mar. 30, 2021). Koon appealed, and we have jurisdiction. 28 U.S.C. § 1291.

## II.    Discussion

Koon sued under the Americans with Disabilities Act of 1990, and the Rehabilitation Act of 1973, claiming a right to a reasonable accommodation.[2] *See*

---

[2] The Fourth Circuit treats claims under the Rehabilitation Act and the ADA as the same. They can be "combined for analytical purposes because the analysis is substantially (Continued)

*Seremeth v. Bd. of Cnty. Comm'rs,* 673 F.3d 333, 336 (4th Cir. 2012); *see also* 42 U.S.C. § 12112(b)(5)(A) (Discrimination includes "not making reasonable accommodations"). Because Koon was eventually given the accommodation he wanted, the only remedy left for him is monetary damages. But to get compensatory damages for such a claim under the ADA—which is all that Koon asks for at this point—a plaintiff must prove intentional discrimination. *See Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 n.9 (4th Cir. 1994); *Baird ex rel. Baird v. Rose,* 192 F.3d 462, 470 (4th Cir. 1999).[3] So to obtain the only remedy he seeks here, Koon must both make out a violation of the ADA's reasonable-accommodation right and show that the violation was intentional. Before digging into that discussion, we must discuss two threshold issues.

## A.    Threshold Issues

To find for Koon and send this ADA claim to a jury, we would need to both wrestle with an intricate Eleventh Amendment issue and take sides in a circuit split on the level of intent required for damages under the ADA. Given their complexity, we should only decide these issues if we must. And here we need not.

First, sovereign immunity: While Congress expressed a clear intention to abrogate state sovereign immunity with the ADA, we must still ask whether it "had the power to

---

the same." *Seremeth v. Bd. of Cnty. Comm'rs*, 673 F.3d 333, 336 n.1 (4th Cir. 2001). This opinion therefore focuses mainly on the ADA claim, but the analysis extends to both.

[3] The ADA cross-references Title VII to limit remedies and procedures. 42 U.S.C. § 12133 (citing 29 U.S.C. 794(a) which cites 42 U.S.C. 2000e–5(f) through (k)). Under 42 U.S.C. 2000e-5(g)(2)(B), compensatory damages are unavailable where "the respondent would have taken the same action in the absence of the impermissible motivating factor."

give effect to its intent" in this area under Section 5 of the Fourteenth Amendment. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 484 (4th Cir. 2005) (quoting *Tennessee v. Lane*, 541 U.S. 509, 518 (2004)). Here, that question would likely require using the intricate congruence-and-proportionality test to determine whether this prophylactic legislation "substantively redefine[d]" the Fourteenth Amendment rights. *Id.* at 484–85 (citing *City of Boerne v. Flores*, 521 U.S. 507, 519–20 (1997)).

As to the circuit split, courts largely agree that compensatory damages are only available to ADA plaintiffs who prove intentional discrimination, but there is a disagreement about what standard to use: deliberate indifference or something more. *Compare Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012), *with Delano-Pyle v. Victoria Cnty.,* 302 F.3d 567, 575 (5th Cir. 2002). While most courts favor the deliberate-indifference standard, our court has not yet determined the appropriate standard.

You can see the complexity here. But we can avoid these difficult issues by assuming for argument's sake that they both favor Koon, that the friendlier standard of deliberate indifference applies, and that sovereign immunity poses no problem to his claim. Even then, Koon cannot win because he has not put forward enough evidence to create a genuine issue of material fact of deliberate indifference by the prison's officers or agents.[4]

---

[4] Sovereign immunity was raised by North Carolina in its briefs, and generally, that issue must be decided first, before proceeding to the substance of a claim. *Va. Dep't of Corrections v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019) (citing *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 779 (2000)). That is so even where "certain merits issues are more easily resolved." *Constantine*, 411 F.3d at, 482 n. 4. But (Continued)

### B.    Deliberate Indifference to Reasonable Accommodation

The deliberate-indifference standard is a common one in the law, though not one we have often applied to disability discrimination.  In essence, the deliberate-indifference standard starts with determining whether there was—objectively speaking—an ongoing or likely violation of some federal right, and then moves on to determining whether a defendant had the appropriate mental state—subjectively speaking—toward that federal-rights violation.  *See Scinto v. Stansberry*, 841 F.3d 219, 225–26 (4th Cir. 2016) (applying deliberate indifference in the Eighth Amendment context).  In other words, there is an objective question about rights and duties, and then a follow-up question about subjective mens rea.  Was there a violation, and did they know about it?

In the ADA context, other circuits have used a two-step deliberate-indifference test that requires:  (1) knowledge that a federally protected right is substantially likely to be violated, and (2) failure to act despite that knowledge.  *See, e.g.*, *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 265 (3d Cir. 2013); *Barber ex rel. Barber v. Colo. Dep't of Rev.*, 562 F.3d 1222, 1229 (10th Cir. 2009).  We largely agree with that

---

our circuit recognizes an exception to this principle when a state asserts its immunity only conditionally and does not "insist" on its defense. *Jordan*, 921 F.3d at 188 (quoting *Strawser v. Atkins*, 290 F.3d 720, 729–30 (4th Cir. 2002)). North Carolina did not insist on its defense in this case. During oral argument, counsel for North Carolina said: "This case is very simple, and it could be resolved without having to ever get to the issues of sovereign immunity." Oral Arg. 19:33. When asked directly, counsel for North Carolina reiterated that the State would happily accept an opinion that focused only on the complaint's factual sufficiency. Oral Arg. 23:22. A refusal to insist on an answer to sovereign immunity is an invitation to sidestep a tricky sovereign immunity question, assuming there is another way for the state to win. *Jordan*, 921 F.3d at 188. Given the potential complexity, we accept that invitation here.

formulation, with the caveat that a plaintiff must begin by showing an ongoing or likely violation of a federally protected right before moving on to prove deliberate indifference through knowledge of that right and a failure to respond appropriately. If there wasn't any ADA violation (or any substantially likely ADA violation), there was nothing to be deliberately indifferent about. So to make out deliberate indifference in an intentional-discrimination case like this, we should look first to whether there was a likely or ongoing violation of federal rights. Only then may we move on to the mental state of deliberate indifference, which requires knowledge of a substantial risk of a deprivation of those rights and a failure to act to resolve that risk. We take each part in turn.

### a.      Right to Reasonable Accommodation

So we begin with whether there was a substantially likely federal-rights violation, i.e., whether there was a violation of the ADA. To make out a basic ADA violation, Koon must show that he: (1) has a disability; (2) was otherwise qualified to get some public program, service, or activity; and (3) was denied that program, service, or activity on the basis of his disability. *Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494, 502–03 (4th Cir. 2016). One way to prove the third prong, denial on the basis of disability, is to prove a "failure to make reasonable accommodations." *Id.* at 503 n.5 (citing *A Helping Hand, LLC v. Balt. Cnty., MD*, 515 F.3d 356, 362 (4th Cir. 2008)).

Koon can make out the first two parts of this standard. A disability is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Everyone agrees that Koon is disabled because of his chronic pain and mobility issues. North Carolina categorizes him as an ADA inmate for that very reason.

12

Next, the prison library is a "service" under § 12132 of the ADA. *See Penn. Dep't of Corrections v. Yeskey*, 524 US 206, 211 (1998). And the prison's own policies demand that all inmates have access to library materials.

The only step of the ADA violation worth more than cursory analysis is whether Koon was, in the language of § 12132 of the ADA, "by reason of such disability . . . subjected to discrimination." Congress has told us that disability "discrimination" includes not just "outright intentional exclusion" but also lesser injustices like "failure to make modifications to existing facilities and practices" and "relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." § 12101(a)(5). From that language, we can derive some right to accommodation. But Congress has also told us that public entities are responsible only for "*reasonable* modifications." § 12131(2) (emphasis added). The Attorney General has the power to promulgate regulations implementing the ADA, and those regulations add further clarity here. *See Nat'l Fed. of the Blind*, 813 F.3d at 506. Public accommodations must be "readily accessible" and "usable" without requiring "fundamental alterations" or causing "undue financial and administrative burdens." 28 C.F.R. § 35.150(a). From all this, we can see that disability discrimination includes the failure to provide reasonable modifications that would make accommodations accessible to the disabled without causing an undue burden to the program.

In the words of the Supreme Court, we ask whether a disabled inmate was denied "meaningful access" to the benefit. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985) (discussing nearly identical language in § 504 of the Rehabilitation Act); *see also Wright v. N.Y. Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (looking for "effective," if not

13

"perfect" access). And because "meaningful access" is the standard, it is not a complete defense to say that some disabled prisoners overcame the hurdle. *See Nat'l Fed. of the Blind*, 813 F.3d at 506. But as we've said, even where "meaningful access" is denied, a public entity need not make "fundamental" or "substantial" modifications to accommodate a disabled inmate; they must only make "reasonable" accommodations. *See Alexander*, 469 U.S. at 300; 28 C.F.R. § 35.150(a)(3).

The line between the reasonable accommodation and the substantially burdensome accommodation may not be obvious in all cases but giving a prisoner access to the first-floor library is comfortably on the reasonable side of the line. And Koon has at the very least created a genuine issue of fact on the issue of a denial of "meaningful access," given the evidence he has put forward about the pain and physical damage caused by going up and down the stairs to the general-population library.

North Carolina half-heartedly argues in its brief that because Koon physically got himself to the general-population library, he was not denied meaningful access to the benefit. But that fact alone cannot resolve the genuine issue of material fact on meaningful access. If a prisoner without the use of his legs left his wheelchair at the bottom of the stairwell and crawled up to the library, no one would doubt it was a denial of meaningful access. *Wright*, 831 F.3d at 73 (finding that access is not meaningful where it is "so inadequate that it deters the plaintiff from attempting to access the services"). The question is whether the pain and challenge of accessing the library was such that it denied him *meaningful* access, which would look to the amount of pain he really felt, what damage was done, and so on, and Koon has done enough to make a fact issue of that question.

14

Koon has made an adequate showing here to get to a jury on whether there was an objective violation of his federally protected rights under the ADA. In other words, construing the evidence in the light most favorable to Koon and drawing all inferences in his favor, he was owed a handicap pass to access the ground-floor library. So his claim depends on whether he has put forward enough evidence to make out the mental state of deliberate indifference toward that federal right. That is the next requirement and the one that Koon does not offer sufficient evidence to meet.

### b.        Deliberate Indifference

Deliberate indifference is, at bottom, an actual-notice standard. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998). Simple failure to comply with the law is not deliberate indifference. It is not enough simply to point to what could or should have been done. That is the language of negligence. Deliberate indifference requires a "deliberate or conscious choice" to ignore something. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (cleaned up). That is more like criminal-law recklessness than mere negligence. *Anderson v. Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017) (discussing *Farmer v. Brennan*, 511 U.S. 825, 836–40 (1994)). An official must know of the dangers to federal rights and nonetheless disregard them. The official must know of the facts from which a federal-rights violation could be inferred and then actually draw the damning inference. *See id.* Deliberate indifference is a high bar.

With that said, knowledge can be shown by circumstantial evidence. *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). When a risk was so "obvious" that an official must have had knowledge, that can get a deliberate-indifference question to a jury. But it

15

must be truly obvious; we should avoid transforming deliberate indifference back into negligence by finding that the reasonably prudent person would have surely known of the issues. We look to whether it was so obvious they *must* have known, instead of whether it was so obvious they *should* have known. The Supreme Court has suggested that circumstantial evidence might make out a fact question on deliberate indifference where the rights violations were "longstanding, pervasive, well-documented, or expressly noted by the prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer*, 511 U.S. at 842 (cleaned up). Again, it's a high bar.

In general, good-faith efforts to remedy the plaintiff's problems will prevent finding deliberate indifference, absent extraordinary circumstances. *See S.B. ex rel. A.L. v. Bd. of Educ.*, 819 F.3d 69, 77 (4th Cir. 2016). That concept has been applied to areas much like this one, areas like medical malpractice. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). The idea is a simple one that flows naturally from the concept of deliberate indifference: Where medical personnel examine and diagnose a patient, where they try to help but fail to live up expectations, that is more naturally described as negligence than indifference. *See Scinto*, 841 F.3d at 225 (suggesting that disagreements over proper medical care rarely meet deliberate indifference "absent exceptional circumstances").

Finally, because deliberate indifference is an actual-notice standard, liability can be imputed to an entity like North Carolina only when some state official actually draws the damning inference. Collective knowledge cannot make out deliberate indifference. *See*

16

*Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Instead, as we have sometimes said in the Title IX context, "an institution can be held liable [for deliberate indifference] only if an official who has authority to address the alleged discrimination and to institute corrective measures has actual knowledge of discrimination and fails adequately to respond." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 700 (4th Cir. 2007) (en banc) (quoting *Gebser*, 524 U.S. at 290) (cleaned up). Other circuits have imported this formulation of deliberate indifference from the Title IX context into the ADA context. *See Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 349 (11th Cir. 2012) (citing *Gebser*, 524 U.S. at 290). So deliberate indifference here requires that Koon prove that some North Carolina official with the authority to address his problem both had knowledge of his federally protected rights and nonetheless failed to help him.

To start, Koon cannot argue that the prison failed to do anything at all. His requests for a medical evaluation were not neglected entirely. There is abundant evidence, most importantly in Koon's own statements, that North Carolina responded to his sick-call requests and administrative grievances. The state provided Koon with medical evaluations, as he requested. In doing so, North Carolina did more than nothing, even if Koon wanted a different outcome. And beyond the evaluations, the prison heard multiple administrative grievances and appeals, again giving Koon's requests a hearing.[5]

---

[5] It is also worth keeping in mind that Koon did eventually get his handicap pass, which further suggests that the prison continued to hear and respond to his requests.

17

Koon argues, instead, that officials in that process were deliberately indifferent to his needs.[6]  From there, Koon mainly focuses on two North Carolina officials who he argues were deliberately indifferent:  Nurse Practitioner Diane Browning and Administrator Bryan Wells.[7]  But Koon has not made the showing required to create a genuine issue of fact that either of those officials was deliberately indifferent to Koon's right to reasonable accommodation.

Koon's best arguments for deliberate indifference are against Browning, but even these aren't enough.  We know that Browning, like all staff at the prison, received ADA training, so maybe that makes out a genuine fact dispute that she had some familiarity with the legal requirements of reasonable accommodations.  Browning also admitted in an affidavit that if she had known about Koon's ADA status and the climbing restriction, she

---

[6] Koon makes an argument in this vein based on a line from a Ninth Circuit opinion worth distinguishing.  The Ninth Circuit has said:  "When the plaintiff has alerted the public entity to his need for accommodation . . . , the public entity is on notice that an accommodation is required."  *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).  While this statement may not be wrong in broad strokes, Koon tries to make too much of it.  *Duvall* discusses how a claim for a reasonable accommodation triggers a statutory duty "to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation."  *Id.*  Under this theory, a failure to investigate a known claim for reasonable accommodation could be deliberate indifference, but that is not this case.  Here there is no question that North Carolina investigated Koon's request for an accommodation.  They did more than nothing.  The very fact that the parties are arguing about Browning's sloppy evaluation and Wells's cursory grievance adjudication shows that North Carolina did more than nothing.  *Duvall*'s broad language cannot help Koon here.

[7] Yet more complexity lurks.  There is a line-drawing issue surrounding "how far up the chain of command one must look to find an 'official'" whose actions can fairly be imputed to the public entity tasked with reasonably accommodating the disabled.  *See Liese*, 701 F.3d at 350.  We need not resolve that question here and assume that Browning and Wells are both sufficiently authorized officials.

18

would have given Koon a handicap pass. That admission also suggests she knew that a no-climbing, ADA inmate would be owed a pass under the ADA. There is also some evidence that she knew who Koon was and saw him walking around Pender—meaning that she may have known he walked with a cane. If you then assume that, as an employee of Pender, she knew its layout, she would have known that the general-population library was up two flights of stairs and that the only way to access the handicap library was with a handicap pass. If accepted, these assumptions might make a start toward showing knowledge of a likely ongoing violation of reasonable accommodation. But even with this chain of assumptions, Koon cannot create a genuine fact question for the jury.

Even if we assume that Browning knew Koon well enough to match his name on the computer screen to the face of the inmate she saw walking around and therefore knew Koon walked with a cane, there is no evidence that walking with a cane was enough by itself to get a handicap pass. *See* J.A. 52, 47.[8] Next, constructive knowledge is not enough, so even though there was a database that listed Koon's climbing restriction, there is no evidence to suggest that Browning looked at that database before rejecting the pass. And Browning says that the request came through as a *renewed* handicap pass, not as a first-

---

[8] Browning explained that "[e]ven though an inmate may use a cane or crutches to walk, that does not automatically entitle them to a handicap pass." J.A. 52. And this statement is consistent with the statement of another staff member suggesting that inmates with a "cane or crutches" may not "have a handicap card." J.A. 47. But even were we to ignore this unrebutted evidence, Koon has provided no evidence to show that walking with a cane would have categorically entitled Koon to a handicap pass.

time pass.[9] As the request was for a renewed pass, her evaluation was quick: She looked briefly at his medical records, saw that he was at Lanesboro where he never had a handicap pass, and knowing that he'd never had one, denied his renewal request.

Koon claims that she should have looked more carefully at his medical records; she should have looked at the database listing inmates' medical restrictions; she should have talked to him, asked about his restrictions, and examined his knee; she should have talked to any of the other prison staffers who knew his mobility issues and knew what he needed. But all those "shoulds" are the language of negligence, arguments about what a reasonably prudent person would have done. Saying that she should have done a better examination is to make a kind of medical malpractice claim, and we know that cannot be the basis of deliberate indifference. *Estelle*, 429 U.S. at 106. Saying that she should have known what others knew is again a claim about negligence, a claim that she wasn't reasonable. Deliberate indifference requires that Browning *knew* that Koon likely could not

---

[9] While there is no evidence in the record about how that request got entered that way, that also means there is no evidence from which a reasonable jury could infer that it was intentionally entered incorrectly.

To make a start toward a showing of deliberate indifference, we might look to a possible tension between Browning's explanation and a statement made by a staff investigator—Robert Norvell. Browning's own statement says that the denial was because of the renewed handicap issue. In contrast, the staff investigator said that the pass was "determined to not be medically necessary" as Koon "did not request orderly assistance." J.A. 47. There isn't necessarily tension there. But since we're at summary judgment, perhaps we could assume these explanations are mutually exclusive. Even still, no reasonable jury could look at Browning's own statements and the staff investigator's statement and conclude that Browning knew Koon was due a pass and intentionally kept it from him. Speculation is the only way a jury could look at this evidence and find that Browning lied.

20

meaningfully access the library as was his right and nonetheless failed to give him a pass. There isn't enough in this record to create a genuine issue of material fact.

The dissent disagrees, pointing to inferences that could be drawn in Koon's favor. But we may only draw inferences that "fall within the range of reasonable probability" based on evidence in the record. *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995). A permissible inference must be reasonably probable given the facts, not just conceivable or possible. So we must reject tenuous inferences that rest upon speculation and conjecture. *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995). In our view, the dissent's efforts to imagine inferential leaps goes too far. For example, the dissent reasonably infers from evidence that Browning had seen Koon around the facility that Browning had knowledge that Koon used a cane and walked with a limp. But it then seeks to stack on top of that inference the suggestion that Browning must have actually known that Koon could not meaningfully access the library. While the first inference is reasonably probable given the evidence, the stacked inference is not. *See Stone v. Liberty Mut Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997) (The nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another" (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Based on the evidence here, we cannot infer that Browning herself had actual knowledge that Koon's statutory rights were being violated by his lack of a handicap pass.

Koon's claims against Wells fare no better. The thrust of Koon's arguments about Wells is that he failed to do a thorough evaluation of the administrative grievance, that he simply "rubber-stamped" Browning's evaluation. We know that Wells met with Koon and

21

that Koon told him about his issues with the handicap pass. But Wells responded to the administrative grievance by relying on Browning's denial and the staff's statement that the handicap pass was "determined to not be medically necessary" as Koon "did not request orderly assistance." J.A. 47. And even assuming that relying on Browning's determination was wrong (given that Koon was challenging that determination as faulty), Wells also relied on the analysis of a staff investigator. That Koon was later granted the pass suggests that these were bad assumptions and that the pass was medically necessary. Koon argues that if Wells had spoken to Browning, he would have known that no real medical evaluation had taken place, and together they could have worked out that Koon needed the handicap pass to access the library, which was his right under the ADA and the prison rules. But again, this is the language of negligence: should have and could have and if only. It just doesn't rise to deliberate indifference. Koon offers no evidence that could lead a reasonable jury to conclude that Wells had actual knowledge that Koon was owed a handicap pass and intentionally failed to give him one.

Because Koon has not created any genuine dispute of material fact here that could lead a reasonable jury to find that either individual defendant or any other agent of North Carolina was deliberately indifferent to his federally protected rights under the ADA, the district court was right to grant summary judgment to Defendants.

*        *        *

Seven months was too long to wait for meaningful access to the prison library. It seems likely that Koon was owed a handicap pass not only as a matter of fairness but also as a statutory right under the ADA. But Koon already has his handicap pass. So he now

22

sues to get damages for the time he was without one, and to get damages, a plaintiff must at least offer sufficient evidence to show that prison officials were deliberately indifferent to his rights.  On this record, Koon has failed to make that showing, so the district court must be

AFFIRMED.

WYNN, Circuit Judge, concurring in part and dissenting in part:

I concur in part with the majority opinion. Specifically, I agree that it would be unwise to address the sticky issue of sovereign immunity on the thin briefing before us. I also concur with the majority opinion's articulation of the deliberate-indifference standard, as well as its conclusion that plaintiff Rodney Koon established his right to a reasonable accommodation—access to a first-floor library—was likely violated.

But I must dissent from the majority opinion's conclusion that Koon failed to create a genuine dispute of material fact regarding Defendants' deliberate indifference. The prison staff at Pender Correctional Institution were well aware that Koon suffered from debilitating hip, leg, and ankle pain stemming from a motor-vehicle accident that shattered his femur and fractured his hip. After all, Koon's medical file designated him as an Americans with Disabilities Act ("ADA") inmate, and Koon had submitted numerous sick-call requests detailing his movement restrictions and ADA status. Prison staff had also observed Koon walking around with his cane. On several of these occasions, Koon spoke directly to prison staff regarding his disability. He also described his problem to the prison warden in person, in a letter, and in a formal grievance he filed on the basis of his disability.

Prison staff also knew that the ADA required them to reasonably accommodate Koon's disability. But instead of heeding that statutory mandate, for months, prison staff ignored or flatly denied—on the thinnest of pretexts—Koon's request for a handicap pass that would allow him to use a ground-floor library. Instead, they quite literally watched as he hopped and hobbled up and down the seventeen steep steps to the regular library. Unsurprisingly, the strain from these exertions caused Koon's surgically repaired legs to

swell for weeks, and eventually contributed to a medial meniscus tear. Even after prison staff reviewed the MRI showing Koon's meniscus tear, they continued to do nothing for months.

That surely is enough to survive a motion for summary judgment if we faithfully apply the Rule 56 standard. Under that standard, we must consider the evidence in the light most favorable to *Koon*. The majority opinion, however, pays lip-service to this basic principle and opts instead to view nearly every dispute through *Defendants'* rose-colored lenses. Because that misapplication of the summary-judgment standard usurps the role of the jury and encroaches on rights protected by the Seventh Amendment, I must respectfully dissent.

## I.

Before I address the majority opinion's misapplication of Rule 56, I must flesh out a few of the facts that are not mentioned in the majority opinion.

## A.

On August 11, 2013, a couple hired limousine driver Rodney Koon to take them to the Asheville Regional Airport. Koon, however, was still high from "an all-night binge of crack cocaine." J.A. 37.[1] During the trip, Koon drove off the road and slammed into a tree at 50–60 miles per hour, killing the couple and their unborn child.

Though Koon survived, the impact from the crash broke his right femur in three places, fractured his left hip, injured his left ankle, and caused him to "spen[d] nine days

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

in a coma." J.A. 37. The femur and hip fractures were serious enough to require surgical intervention. As part of the surgery, doctors inserted metal rods into Koon's femur and hip to hold the broken bones together. Though these fractures have since healed, Koon continued to experience pain in his right knee, left hip, and left ankle for years following the crash.

In 2014, Koon pleaded guilty to two counts of felony death by vehicle and one count of involuntary manslaughter and was sentenced to serve between one hundred forty-six and two hundred months' imprisonment.

For a time, Koon was housed at North Carolina's Central Prison. While at Central, Koon stayed at the prison healthcare complex for around forty days. In his discharge summary, the doctor treating Koon described Koon's history of femur and hip fractures as well as the "internal fixation and placement of rods" to support said fractures. J.A. 57. The doctor also noted that, due to his lower-body injuries, Koon "walked with an antalgic gait"—a limp caused by pain—and "ambulate[d] with [a] cane for short distances and [a] wheelchair for long distances." J.A. 57. An X-ray of Koon's knee showed mild "patellofemoral compartment osteoarthritis" and swelling. J.A. 57. To keep Koon's pain in check, the doctor prescribed Tylenol and ibuprofen and recommended Koon continue to use a cane and wheelchair to get around.

During his time at Central, Koon attended physical therapy sessions with other inmates. At therapy, Koon attempted to climb a three-step prop, but was unable to do so without "difficulty or pain." J.A. 85. Due to that pain, he was reduced to hopping and jumping up and down the stairs to complete his exercise.

26

Koon was eventually transported to Lanesboro Correctional Institution. Shortly after he arrived at Lanesboro, Koon submitted a reasonable-accommodation request form to prison authorities. In his request, he detailed the "intensive damage to [his] right leg (femur, knee) which [is] held together by rods," as well as his left hip fracture. J.A. 41. He noted that he was unable to "walk, sit[,] or stand for long periods of time" and "some days not at all." J.A. 41. On those days that he was able to get around, he could only do so with the assistance of a wheelchair or cane. He further highlighted that he was unable "to go up and down steps without difficulty" or "push, pull[,] or carry anything with much weight to it." J.A. 41. Due to these limitations, he asked the Department of Public Safety ("the Department") to declare him disabled and exempt him from certain activities. To facilitate the Department's inquiry, Koon authorized the agency to access his health information.

The Department approved Koon's reasonable-accommodation request in less than a month. It agreed that Koon had "considerable" and "[p]ermanent/[l]ifelong" physical limitations that made him a "qualified person with a disability" under the ADA. J.A. 42–43. As part of its approval, the Department granted him access to a cane and a bottom bunk, as well as temporary access to a wheelchair. It also listed several medical restrictions, including total bars on climbing, pushing, or pulling, as well as a 25-pound lifting restriction.

Though Koon's ADA accommodation excused him from job duties at the prison, his injuries continued to cause him pain. In November 2015, Koon complained to prison doctors about his ongoing knee pain. Doctors at Lanesboro examined Koon's right knee

27

and ultimately diagnosed him with "internal derangement of [the] knee."[2] J.A. 54. Around the same time, Koon also complained to doctors of pain in his hips and ankle and swelling in his hip. Medical imaging revealed no significant abnormalities.

To address Koon's discomfort, his doctors began prescribing opiates, since mild painkillers like ibuprofen proved "[un]helpful" in controlling Koon's "chronic pain." J.A. 66. Doctors also scheduled Koon for a series of orthopedic consultations with outside healthcare providers. On January 11, 2016, an outside provider conducted an X-ray and MRI of Koon's right femur and knee that confirmed his derangement diagnosis but revealed no significant structural damage.

Despite his continuing medical issues, Koon did not request a handicap pass to access the prison library at Lanesboro because all of Lanesboro's housing, programming, and services—including the library—are accessible without using "even one (1) [stair] step." J.A. 88.

B.

On March 17, 2016, Koon was transferred to Pender Correctional Institution. That same day, he was processed by Pender medical staff. As part of their intake assessment, staff reviewed his "medical restrictions" and "ADA status." J.A. 90.

---

[2] Internal derangement of the knee is a "chronic mechanical condition" that causes "[p]ain," "[s]welling and stiffness," and "[w]eakness or instability" in the joint. Teresa Beard, *What to Know About Internal Derangements of the Knee*, WebMD, https://www.webmd.com/pain-management/knee-pain/what-to-know-about-internal-derangements-of-the-knee (last modified Dec. 16, 2021) (saved as ECF opinion attachment).

About two weeks later, Koon tried to access the library and gym. However, a prison attendant told him that the regular gym was off-limits for those with walking canes. And though a handicap-accessible library existed on the prison's first floor—the floor where Koon was housed—he was told that he could not access that library without a "handicap library and gym pass/card." J.A. 164. Instead, the attendant directed him to the "regular" library, which was located up two flights of stairs (seventeen steps in total). J.A. 164.

Koon explained that he was an ADA inmate with a disability and that he wanted to use the handicap-accessible library and gym. The attendant replied that he should have received a handicap pass during his intake assessment and called the prison's medical unit. After the attendant told the medical unit that Koon was an "ADA inmate," the medical unit relayed that they "would look into it," but that in the meantime, Koon would have to use the regular library (and apparently forgo the gym). J.A. 165.

For the next several months, Koon did just that. But due to his injuries he "had to hop and jump to get up and down the steps" to the library. J.A. 165. Each time he climbed and descended the stairs, his injured right knee would "swell and double in size" and stay that way for up to two weeks. J.A. 165. To take some of the burden off of that leg, he would "shift [his] weight to [his] left leg," causing temporary swelling in that knee as well, though it "usually went down after a couple of days." J.A. 165–66. According to Koon, the pain in his legs was "unbearable" and "to[o] much to take." J.A. 166–67.

C.

During the same time period, Koon repeatedly sought a handicap pass for library and gym access. To start, on April 4, 2016, Koon submitted an inmate request form to his

29

case manager. His request explained that he was an "<u>ADA</u> assigned inmate" who had been unable "to attend the library or exercise" in the gym because he lacked a handicap pass, "which is discrimination." J.A. 125. In case that was unclear, he reiterated, "I am an <u>ADA</u> inmate. Why do I not have a pass for [the library and gym] already?" J.A. 125. No response is found in the record.

That same day, Koon stopped a prison official in the yard and asked him for his help obtaining a handicap pass. The official wrote his name down. Four days later, Koon again stopped the same official and repeated his entreaty. Once more, the official took his name down. Nothing came of Koon's efforts.

Koon next turned to prison medical staff. At Pender, "an inmate may request a handicap pass by submitting a sick call request" to medical staff. J.A. 52. Once a request is made, a triage nurse will evaluate the inmate and, if warranted, "make a request for a medical provider (doctor or nurse practitioner) to evaluate the inmate." J.A. 52. "The inmate's request for a handicap pass will [then] be determined based on the medical provider's [follow-up] evaluation." J.A. 52.

According to the majority opinion, this medical-provider evaluation "needn't be face-to-face." Majority Op. at 5. That may be true regarding a "*renewal* request," but reading the record in the light most favorable to Koon indicates that a medical provider's *initial* handicap-pass decision requires a face-to-face evaluation. *See* J.A. 52 (emphasis added) (distinguishing between an "evaluation" of the inmate, as required for an initial request, and "a review of the inmate's medical records," which sufficed for a renewal request).

30

Koon made at least four relevant sick-call appointment requests:

- On April 8, Koon had a sick-call appointment with Nurse Helen Whitaker.[3] He requested the appointment to get pain medication to alleviate the knee pain he exacerbated by trying to climb the steps to the regular library. During his appointment, Koon told his nurse about his no-climbing restriction and ADA status. The nurse pulled up Koon's medical records on the computer and confirmed what Koon was telling her was accurate.

- On April 24, Koon submitted another sick-call appointment request, explaining that he was an "ADA inmate" who "[couldn't] go up and down steps" and who "use[d] a cane for a walkin[g] aide." J.A. 124. Because of these issues, he wanted "a pass for [the] handicap library and exercise room." J.A. 124. He also identified his duty assignment as "ADA." J.A. 124.

- On May 10, Koon filed another sick-call appointment request. Once again, he identified his duty assignment as "ADA." J.A. 127. His request sought a renewal of his opioid painkillers, among other drugs, and closed by asking for help securing a "handicap pass." J.A. 127.

- On June 5, Koon submitted yet another sick-call appointment request, again noting he was an "ADA" inmate. J.A. 123. He explained that he was a "Chronic Disease Patient" seeking a nurse or doctor to "follow up about" securing a "handicap pass for [the] library [and] exercise room." J.A. 123.

While these requests were pending, on June 17, Koon "was finally sent to Central Prison . . . for an MRI by ortho[pedic] staff on [his] right knee." J.A. 169.

---

[3] Koon notes this encounter in his declaration, but the request for this April 8 sick call is not in the record. All of the other sick-call appointments Koon references occurred on other days. *See* J.A. 123 (June 6); J.A. 124 (April 23); J.A. 127 (May 11); J.A. 128 (April 1). And none of the appointment requests in the record were triaged by Nurse Helen Whitaker. *See* J.A. 123, 124, 127, 128. If we give Koon the benefit of the doubt—as we must at this stage—he must be describing a different encounter. *See Lyons v. City of Alexandria*, 35 F.4th 285, 288 (4th Cir. 2022) ("The district court may properly rely on the nonmoving party's own deposition testimony, affidavits, or declarations to reject summary judgment.").

31

D.

The very same day Koon was at Central getting his knee looked at, Family Nurse Practitioner Diane Browning—the primary healthcare manager at Pender—got around to reviewing Koon's request for a handicap pass. At the time she received this request, Browning was already "familiar with Rodney Koon," having seen him "throughout the facility," "heard about [Koon] from other healthcare providers, [and] reviewed portions of his medical records." J.A. 53. Browning was also familiar with the ADA's requirements, having received training on the statute's policy and procedures.

It is not clear which of the four sick-call requests that Koon made—April 8, April 24, May 10, or June 5—prompted a nurse to forward Koon's request on for Browning's review. According to Browning, Koon's request popped up on her computer as "a request for a *renewal* handicap pass." J.A. 53 (emphasis added). Since that was purportedly the case—a fact Koon hotly disputes—she started by "review[ing] [Koon's] medical records." J.A. 53.

At Pender, inmates' medical information is stored in multiple different systems. "Most of the patient's medical information is stored" in a system called the Healthcare Electronic Record for Offenders ("HERO"). J.A. 51. Other information, including "some" of the inmates' medical restrictions, can be viewed within the Offender Public Information System ("OPUS"). J.A. 152. Browning plainly had access to HERO when she reviewed Koon's request. Though the record is a bit unclear, it seems she also had access to portions of OPUS at that time. *See* J.A. 50–51 (Browning acknowledging that she (1) obtained

32

access to portions of OPUS "several months" after starting work and (2) had worked at Pender for nine months when she reviewed Koon's request).

Browning, however, says that she only reviewed Koon's medical records in HERO. After completing her review, Browning concluded that "no handicap pass had ever been issued for . . . Koon." J.A. 53. Specifically, Browning notes that Koon was "evaluated" at Lanesboro "in February 2016, and that no handicap pass was issued at that time." J.A. 53.

It is not clear what February 2016 "evaluation" Browning is referring to. Koon's medical records indicate that he was seen by providers several times that month, but none of the entries refer to an "evaluation" or a "handicap pass." Perhaps the most relevant entry is a comment entered into Koon's medical records by a nurse on February 28, 2016, noting that an unnamed doctor requested Utilization Review Board approval of an opioid prescription for Koon, a "patient with chronic pain of hips and knees" following a "multiple trauma" event. J.A. 66. It goes on to note that "the severity and chronicity of [Koon's] post traumatic pain is documented in the record," "ibuprofen and carbamaz[e]pine have not been helpful" in treating Koon's pain, and "given the chronicity of his symptoms, the MD is requesting a 90 day approval for Tramadol," an opioid painkiller. J.A. 66. However, there is no mention of an evaluation or request for a handicap pass.

At any rate, Browning asserts that since she could find no record of a "previously ordered handicap pass," she decided to "den[y] the request for a *renewed* handicap pass" without meeting, speaking with, or medically evaluating Koon. J.A. 53 (emphasis added). And despite the clear medical documentation of Koon's serious hip and knee pain, Browning also claims she "was unaware that . . . Koon was an ADA inmate, and . . . did

33

not know [about] his ADA restrictions/accommodations." J.A. 54. If she had known that Koon "was an ADA inmate with a climbing restriction," she says she "would have issued him a handicap pass." J.A. 54.

E.

After Browning denied his request, Koon sought to appeal to a higher authority. On June 24, he "spoke directly in-person" to defendant Bryan K. Wells, the warden at Pender. J.A. 168. A few days later, Koon wrote Wells a letter further describing his situation.[4] And on June 30, Koon filed a formal grievance challenging Browning's denial.

In that grievance, Koon reiterated that he was an "ADA inmate" who was unable to fully access the library because it was located up two flights of stairs. J.A. 45. He claimed that since he was "being kept from enjoying the same privileges as other regular population inmates," he was "being DISCRIMINATED against because of [his] DISABILITY." J.A. 45. He also described his numerous attempts to secure a handicap pass, including his sick-call requests, and complained that the Department "knew everything about [his] medical [conditions] before [he] arrived," including his "ADA status," so a handicap pass "should've been ready." J.A. 46.

While his grievance was pending, Koon returned to Central for a follow-up visit on July 11. Orthopedic staff at Central told Koon his MRI had revealed a "posterior medial

---

[4] This letter, which Wells purportedly received on June 29, is not in the record.

meniscal tear" in Koon's right knee.[5] J.A. 74. Because previous medical imaging had not revealed this injury, the added strain of climbing the stairs to the library must have contributed to it.[6] To alleviate the pain, doctors injected a corticosteroid into Koon's knee and placed a "[r]ush" request for the Department to approve an opioid painkiller for Koon. J.A. 74.

When Koon returned to Pender on July 11, he met once more with Nurse Whitaker to discuss his care plan. As part of his check-in, Whitaker copied Koon's MRI documentation so it could be reviewed by Browning.[7] Whitaker also noted that Koon "uses [a] cane for ambulation." J.A. 134. Browning reviewed this assessment and Koon's records from Central—which again, revealed a medial meniscus tear—on July 16. However, Browning took no further action.

A few days later, prison staff denied Koon's grievance. The decision explained that on June 17, Browning had denied Koon a handicap pass because it was not "medically necessary," but it did not elaborate further. J.A. 47. Koon appealed the denial to Warden

---

[5] A meniscus injury can make "[w]alking up or down stairs . . . particularly painful, and may also cause increased swelling in the knee." *Torn Meniscus*, Hospital for Special Surgery, https://www.hss.edu/condition-list_torn-meniscus.asp (last visited Aug. 5, 2022) (saved as ECF opinion attachment).

[6] Though Nurse Browning disputes this inference, it is certainly a reasonable one. And all reasonable inferences must be drawn in Koon's favor.

[7] Although Nurse Whitaker's terse language makes it difficult to understand her intake assessment, she seems to state that she reviewed Koon's "[Central Prison] orthopedics note," made a copy for Koon's "medical records," and placed that copy "on review for [Browning]." J.A. 134.

35

Wells. According to Wells, he asked the Pender medical unit to review Koon's complaint "to determine if the handicap card was needed." J.A. 21. "[M]edical responded that [Koon] was reviewed by [Browning] who determined that [a] handicap card was not medically necessary and that [Koon] could access the regular library." J.A. 21–22. So, Wells claims he denied Koon's appeal on that basis, explaining that "[a]fter a careful review of your grievance, I find that staff has adequately responded to your complaint." J.A. 48. Koon further appealed to the Inmate Grievance Resolution Board but was turned away after the Board examiner found that Pender staff had "adequately addressed [his] grievance concerns." J.A. 49.

While this final administrative appeal was playing out, Koon went back to the drawing board and asked another nurse for help securing a handicap pass during an August 19 appointment in the chronic-disease clinic. He also submitted yet another inmate request form for a pass, this time to the ADA case manager at Pender, Jeffrey Shelton. Once again, he was unsuccessful.

Finally, on October 18, 2016—more than seven months after Koon first arrived at Pender—another Pender doctor reviewed Koon's medical records, restrictions, and sick-call requests and promptly issued Koon a handicap pass.

II.

Before I go any further, I must pause to flesh out yet another issue the majority opinion does not address: the governing procedural standard. As all parties agree, this dispute is governed by Federal Rule of Civil Procedure 56(a). But the majority opinion does not even *cite* to Rule 56(a). So, Rule 56(a) is worth reviewing in some detail.

36

That Rule provides that a court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if it "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022) (internal quotation marks omitted) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)). Ultimately, unless we can determine that the evidence "is so one-sided that [the moving] party must prevail as a matter of law," the case must go to the jury. *Anderson*, 477 U.S. at 252.

Whether the Rule 56(a) standard is met is a question we review de novo. *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022) (Richardson, J.). In conducting this de novo inquiry, we *must* "view the evidence in the light most favorable" to the nonmoving party—Koon—and "draw all reasonable inferences in his favor." *Id.* However, we *must not* "weigh the evidence or make credibility calls, even if we do not believe he will win at trial." *Id.*

The reason the deck is stacked so heavily against the moving party—here, Defendants—is simple: "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are *jury functions*, not those of a judge." *Anderson*, 477 U.S. at 255 (emphasis added). And we may not encroach on those jury functions without running afoul of the Seventh Amendment. *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 221 n.12 (4th Cir. 1978) ("If the issue of liability were inappropriately disposed of on a Rule 56 motion, then [the nonmoving party] would have a [Seventh

37

Amendment] right on remand to have . . . [their dispute] submitted to a jury."); *Harris v. Interstate Brands Corp.*, 348 F.3d 761, 762 (8th Cir. 2003) (holding a "Seventh Amendment right to a jury trial" exists "with respect to disputed issues of fact").

With these procedural and constitutional precepts in mind, I turn to the key question: has Koon established genuine disputes of material fact regarding Defendants' deliberate indifference? The answer is a resounding yes.

## III.

To satisfy the majority opinion's deliberate-indifference test,[8] Koon must establish three requirements: (1) harm to a federally protected right was substantially likely; (2) Defendants knew about that likelihood; and (3) Defendants failed "adequately to respond." Majority Op. at 17 (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 700 (4th

---

[8] As the majority notes, we have not yet held that compensatory damages are available to ADA and § 504 plaintiffs who prove deliberate indifference. Majority Op. at 10. But an overwhelming majority of our sister circuits already have. *Compare Lacy v. Cook Cnty.*, 897 F.3d 847, 863 (7th Cir. 2018) (adopting a deliberate-indifference test for intentional discrimination under Title II of the ADA), *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) (ADA and Rehabilitation Act), *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012) (Rehabilitation Act), *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (ADA and Rehabilitation Act), *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) (ADA and Rehabilitation Act), *and Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999) (Rehabilitation Act), *with Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 575 (5th Cir. 2002) ("There is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the [Rehabilitation Act]."). *But see Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020) (essentially acknowledging that *Delano-Pyle*'s standard is the rough equivalent of the deliberate-indifference test: a plaintiff must show the defendant "knew" about the risk of harm and "made no attempt to adapt"). I would join this consensus and hold that compensatory damages are available to ADA and § 504 plaintiffs who meet the majority opinion's deliberate-indifference standard.

Cir. 2007) (en banc)). I agree with the majority opinion that Koon has shown his right to a reasonable accommodation was likely violated.[9] *Id.* at 11–14. But I disagree with the majority opinion's analysis of the second and third prongs. If we properly apply the summary-judgment standard, Koon has sufficiently established that prison officials "knew that Koon likely could not meaningfully access the library as was his right and nonetheless failed to give him a pass." *Id.* at 19–20.

A.

To satisfy the second prong of the deliberate-indifference test, a plaintiff must show that the defendant actually knew a violation of the plaintiff's rights was substantially likely. *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 266 n.26 (3d Cir. 2013) ("Deliberate indifference requires *actual knowledge*; allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference."). Whether a defendant possessed this knowledge "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

For instance, a factfinder may infer "that a prison official knew of a substantial risk [to plaintiff's rights] from the very fact that the risk was obvious." *Id.*; *see Makdessi v. Fields*, 789 F.3d 126, 135 (4th Cir. 2015) ("[A]ctual knowledge can be shown by

---

[9] Like the majority, though my dissent "focuses mainly on the ADA claim, [my] analysis extends to both" the ADA and Rehabilitation Act claims. Majority Op. at 9 n.2. Defendants half-heartedly contend that Koon failed to plead a Rehabilitation Act claim as a pro se litigant. I agree with the majority opinion's implicit rejection of this challenge. *See id.* (declining to limit its analysis to the ADA claim).

circumstantial evidence that the risk was so obvious that the Defendants had to know it.").

A substantial risk to a plaintiff's rights is sufficiently obvious if it is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning [this] risk and thus 'must have known' about it." *Farmer*, 511 U.S. at 842.

To be sure, "the obviousness of a particular injury is not conclusive of an official's awareness of the injury." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). An official could always show that even if the risk were obvious, they nevertheless failed to appreciate it. *Farmer*, 511 U.S. at 844 ("[I]t remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety."). However, officials may not "skirt liability" by "simply bury[ing] their heads in the sand." *Makdessi*, 789 F.3d at 133. If the evidence shows that the official claiming ignorance "merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist," then he was just as deliberately indifferent as an official with actual knowledge of the risk. *Farmer*, 511 U.S. at 843 n.8.

In the present case, Koon identifies two officials that he claims had actual knowledge of his discrimination: Nurse Browning and Warden Wells.[10] Because he has

---

[10] The majority opinion assumes but does not decide that Browning's and Wells's actions can be fairly imputed to North Carolina. Majority Op. at 18 n.7. There is little doubt they can. In an analogous context, the Supreme Court has held that an official's discrimination is attributable to a school if the official who "has authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf has (Continued)

identified disputed material facts that go to each official's knowledge, this element cannot be resolved at summary judgment.

1.

I first turn to the disputed facts going to Browning's knowledge.[11] But before I get there, I must note something that isn't truly disputed: Browning's familiarity with "the legal requirements of reasonable accommodations." Majority Op. at 18. Browning, like all staff at Pender, received ADA training "on the policy and procedure regarding the ADA Process for inmates." J.A. 159. We can surmise this training must have included some discussion of the duty to reasonably accommodate prisoner's disabilities.

Indeed, Browning concedes that if she had known that Koon "was an ADA inmate with a climbing restriction, [she] would have issued him a handicap pass." J.A. 54. We may therefore deduce that Browning knew that a disabled inmate who could not meaningfully access the regular library would be owed a handicap pass. Browning does

actual knowledge of discrimination in the [school's] programs and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Both Browning and Wells, as Pender's chief medical officer and warden, respectively, were officials with the authority to address Koon's discrimination. *Cf. Liese*, 701 F.3d at 350 (concluding that certain doctors' actions could be attributed to a hospital because they were "officials" with the authority to determine whether a patient qualified for an interpretive aid). And as explained below, there is a genuine dispute regarding their knowledge of and response to Koon's discrimination.

[11] Defendants argue that Browning is an improper defendant for this lawsuit. The majority opinion does not address this issue but does address Browning's actions, so I assume it has rejected that argument. Even if it had not, that would not change anything, since North Carolina—which is a proper defendant—may be held responsible for Browning's actions. *See supra* note 10.

not argue otherwise, so the majority opinion's attempt to inject uncertainty into this inquiry on Browning's behalf must fail. *See* Majority Op. at 18 (suggesting there is "maybe" a genuine dispute regarding Browning's knowledge of reasonable-accommodation law but pointing to no facts from which a reasonable jury could infer otherwise). And of course, to the extent there *is* any such dispute, that is a genuine dispute of material fact that would need to be resolved by a jury.

i.

Which brings us to the critical question: did Browning know Koon was a disabled inmate who "likely could not meaningfully access the [regular] library" when she denied his request? *Id.* at 19–20. If we consider the record in the light most favorable to Koon, we must find a genuine dispute regarding Browning's knowledge, for several reasons.

First, we can infer Browning knew Koon was disabled because she likely saw him with his cane. While there is no direct evidence of her knowledge, we do know that (1) Koon walked around Pender with a cane, and (2) Browning had seen Koon "throughout the facility." J.A. 53. If we put those two facts together, it is reasonable to infer Browning saw Koon walking with a cane. In case we were unsure about this inference, Koon's medical records include several references to his cane, and Browning admitted reviewing at least some of those records. *See* Majority Op. at 6 n.1 (acknowledging that Browning "would have known" that Koon used a cane based on her review of his medical file). And at least one of Koon's sick-call appointment requests referred to his cane. While it is not clear exactly how these requests were inputted into the prison's medical-records system

42

and/or forwarded on to Browning, it is reasonable to infer that they were passed along in some form.

The majority opinion observes that "there is no evidence that walking with a cane was enough by itself to get a handicap pass." *Id.* at 18. In effect, the majority views the evidence in a light favorable to Browning and finds that she maintained some plausible deniability: she could have seen Koon with his cane and *still* may not have been *totally* sure that he was entitled to a handicap pass.[12]

But the only evidence in the record supporting the majority's assertion that a cane alone is *not* enough is Browning's self-serving statement to the same effect and an ambiguous remark from a staff investigator in his denial of Koon's grievance. *See* J.A. 52 ("Even though an inmate may use a cane or crutches to walk, that does not automatically entitle them to a handicap pass."); J.A. 47 ("Inmates that have a cane or crutches and do not have a handicap card for handicap gym/library, may access regular gym and library."). However, at this stage "we may not take" Browning's assertion "as true." *Hensley ex rel. N.C. v. Price*, 876 F.3d 573, 579 (4th Cir. 2017). Declining to "credit [her] evidence" seems especially wise here, *id.*, where the very prison policy manual Browning cites in her affidavit explains that an inmate must be found to be at least partially mobility disabled to

---

[12] The majority opinion injects further doubt by observing we must also "assume that Browning knew Koon well enough to match his name on the computer screen to the face of the inmate she saw walking around and therefore knew Koon walked with a cane." Majority Op. at 19. But Browning told us that she was "familiar with Rodney Koon." J.A. 53. Unless we are willing to draw inferences in Defendants' favor, we *must* infer, based on her statement, she would have matched his name to his face.

43

even *get* a cane, *see* Health Services Policy & Procedure Manual: Disabilities, N.C. Dep't of Correction (2009), https://files.nc.gov/ncdps/div/Prisons/HealthServices/TX_CareTreatmentPatient/TX_VII_Disabilities/txVII2.pdf (saved as ECF opinion attachment). It would make little sense if an inmate declared mobility disabled enough to use a cane could simultaneously be insufficiently disabled to merit a handicap pass to the ground-floor library.

Further, even supposing that knowing an inmate uses a cane is not enough, standing alone, to know he is entitled to a handicap pass, the Supreme Court has told us that a plaintiff can show "a prison official [actually] knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. And it is obvious that an inmate walking with an "antalgic gait" with the assistance of a cane would have trouble meaningfully accessing a second-floor library up seventeen steps. J.A. 57. Nearly anyone who saw such an individual would assume the same. Consequently, if Browning knew Koon walked with a cane, a reasonable juror could infer that Browning had also concluded that (1) Koon had a mobility disability and (2) Koon would have trouble climbing the stairs to the regular library.[13]

The majority opinion resists this natural conclusion by characterizing it as one inference stacked on top of another. Majority Op. at 21. According to the majority, we can

---

[13] The majority opinion points out we must also assume "[Browning] would have known that the general-population library was up two flights of stairs and that the only way to access the handicap library was with a handicap pass." Majority Op. at 19. That seems like a very safe assumption to me. At the time, Browning had worked at Pender for more than nine months, and it was her job to issue handicap passes for library access.

44

infer that Browning knew Koon used a cane, but not that he would have had trouble, therefore, climbing two flights of stairs. *See id.* But this would allow Browning to do exactly what our precedent guides against—bury her head in the sand to an obvious risk. *See Makdessi*, 789 F.3d at 133. And it bears emphasizing that we can infer Browning's knowledge based on not one, but several independent facts in the record. *See* J.A. 52–53.

Next, we can infer Browning's knowledge of Koon's disabled status from her review of Koon's medical records. Browning admitted that on the day she received Koon's request for a handicap pass, she "reviewed [Koon's] medical records in [HERO]." J.A. 53; *see also id.* (Browning acknowledging she was "familiar with Rodney Koon" because she had "reviewed portions of his medical records"). While it is not clear which records she is referring to apart from the February 28 "evaluation," a reasonable juror could surmise that even a casual and haphazard reviewer of Koon's medical records would conclude he was at least partially disabled.[14]

Those records note that Koon broke his right femur "in three places" and fractured his hip following a "multiple trauma" event, J.A. 66, 71; his fractures were serious enough to require surgical insertion of reinforcing metal rods; Koon takes prescription opioids for "chronic pain" in his hips, legs, and ankle, J.A. 69, 71; he has been diagnosed with "internal derangement of [his right] knee," J.A. 63, 71; he has sought and received multiple orthopedic referrals—including one on the very day Browning reviewed his request for a

---

[14] Ironically, the only note Browning specifically acknowledges reading—the February 28 comment—says that the "severity and chronicity of [Koon's] post traumatic pain *is documented in the record*." J.A. 66 (emphasis added).

45

handicap pass; he walks "with an antalgic gait," J.A. 57; and he "ambulates with [a] cane for short distances and [a] wheelchair for long distances," J.A. 57. To be sure, other notes in the record suggest that Koon's injuries had healed somewhat. But again, if we read the record in the light most favorable to Koon, then a reasonable juror could conclude that Browning knew Koon had a movement disability that would make stair-climbing impractical based on her review of his medical record on June 17.

The majority opinion—once again, taking Defendants' view as a given—counters that even if Browning was aware of Koon's medical issues from her review of his records in HERO, "there is no evidence she knew he had a [no-]climbing restriction." Majority Op. at 6 n.1; *see also id.* at 19 (arguing "there is no evidence to suggest that Browning looked at [the OPUS] database" containing inmates' medical restrictions "before rejecting the pass"). Yet even if there wasn't such evidence—which, as discussed below, is not true—Koon is not required to show that Browning knew he had a *categorical* climbing restriction that completely barred him from accessing the regular library.

Rather, "[t]he question is whether" Browning knew "the pain and challenge of accessing the library was such that it denied [Koon] *meaningful* access" to the regular library. *Id.* at 14; *see also id.* at 19–20 (stating the issue is whether "Browning knew that Koon likely could not *meaningfully access* the library as was his right" (emphasis added)). While evidence of a categorical climbing restriction may be *sufficient* to alert Browning of a meaningful-access problem, it is not *necessary*. Other evidence in the record could have alerted Browning to Koon's meaningful-access issues as well. *See id.* at 5 n.1 (acknowledging Browning "would have known" that Koon used a cane for short distances

46

and a wheelchair for long distances, and that "Koon experienced pain and inflammation in his knee, hips, and ankle").

Third, we can also infer Browning's knowledge of Koon's disability and climbing struggles from Koon's sick-call appointment requests. As Browning acknowledges, once an inmate makes a sick-call request, a nurse conducts a triage evaluation. That triage nurse can then "make a request for a medical provider (doctor or nurse practitioner) to evaluate the inmate." J.A. 52. Though the mechanism of how the triage nurse makes such a request through HERO is unclear from the record, a reasonable inference is that the triage nurse would either pass along a copy of the sick-call request itself or notes regarding the triage evaluation.

If that is the case, then Browning must have been on notice of Koon's limitations. During Koon's April 8 sick call with Nurse Whitaker, he explicitly told her about his no-climbing restriction and his ADA status. He also told her his disability was exacerbated by climbing the steps to the regular library. Two weeks later, he submitted another sick-call request explaining that he was an "ADA inmate" who "can't go up and down steps" and who "use[d] a cane for a walkin[g] aide." J.A. 124. Two weeks after that, Koon filed another request identifying himself as an "ADA" inmate. And four weeks after that he submitted yet another request, noting he was an "ADA" inmate suffering from "Chronic Disease." J.A. 123.

While we do not know which of these sick-call requests prompted a triage nurse to request Browning's review, it hardly matters. Each of them noted he was an ADA inmate, and two of the four expressly noted his issues climbing steps. But if we had to choose one,

47

it seems reasonable to assume it would be the April 8 sick call with Nurse Whitaker. Not only was this the first, but it was also the most explicit: Koon told Whitaker, in no uncertain terms, that he was an ADA inmate with a no-climbing restriction. She then checked this information on the computer to confirm it. Unless we improperly draw inferences in favor of Defendants, we must assume that Nurse Whitaker did her job, concluded Koon had submitted a meritorious request, and passed this information along to her superior, Browning.

So, putting this all together, Koon has shown: (1) Browning was aware Koon used a cane; (2) Browning reviewed medical records describing the extent and severity of Koon's injuries; and (3) Browning likely reviewed at least one sick-call appointment request detailing Koon's ADA status and no-climbing restriction. In other words, Koon has shown Browning was "exposed to information concerning" his "longstanding, pervasive, well-documented, or expressly noted" disability and stair-climbing issues, and "thus 'must have known' about [them]." *Farmer*, 511 U.S. at 842. At the very least, she must have "strongly suspected" that Koon could not meaningfully access the regular library. *Id.* at 843 n.8; *see also Makdessi*, 789 F.3d at 133 (holding officials may not "skirt liability" by "simply bury[ing] their heads in the sand"). That is surely enough to create a genuine dispute regarding Browning's knowledge.[15]

---

[15] Whether Browning possessed this knowledge when she denied Koon's request is plainly material, since she admits that Koon would have been owed a handicap pass if she had known about his limitations.

ii.

Even if we concluded that Browning was completely unaware of Koon's plight when she denied his request on June 17, 2016, Koon has also created a genuine dispute regarding Browning's knowledge *following* that denial.

As noted above, on July 11, 2016, Koon returned to Central Prison for a follow-up visit to discuss his June 17 MRI. The report from that visit notes that Koon has "been ambulating for 2 years with pain in his [right] knee," which "[h]urts with walking." J.A. 74. The report goes on to explain that Koon's MRI revealed a "posterior medial meniscal tear." J.A. 74. To alleviate Koon's pain, doctors injected a corticosteroid and placed a request for opioid painkillers. When Koon returned to Pender, Nurse Whitaker conducted an intake assessment, noting that Koon "uses [a] cane for ambulation" and that doctors at Central had requested opioid painkillers for Koon. J.A. 134.

If we read the record in the light most favorable to Koon, Browning reviewed that report and Nurse Whitaker's accompanying intake assessment on July 16. So, at that time, Browning must have definitively known that Koon (1) walked with a cane and (2) had a disabling injury that would meaningfully restrict his ability to climb the stairs to the regular library. That knowledge is material because Koon did not get a handicap pass until October 18—more than three months later. Yet nothing in the record shows that Browning took any further action during this time.

2.

Koon has also established genuine disputes of fact going to Warden Wells's knowledge. Like Browning, Wells has admitted he is familiar with the ADA's reasonable-

49

accommodation requirement. He has acknowledged this requirement applies "to all otherwise qualified individuals for existing jobs, programs, activities, or services offered by Prisons." J.A. 152. And he has recognized that it was *his* "responsibility to ensure that policy is applied." J.A. 152. So, to the extent Wells disputes that he was familiar with the applicable statutory and regulatory requirements (which he doesn't, really), Koon has created a genuine dispute related to that material fact.

Which again leaves us with the key question: did Wells know that Koon was a disabled inmate who would be unable to meaningfully access the regular library?

Though the evidence is a bit spottier, Koon has pointed to several facts and inferences that create a genuine dispute of fact.[16] To start, we know that on June 24, Koon "spoke directly in-person" to Wells. J.A. 168. As noted above, since Koon traveled around Pender with his cane, we can infer that Wells must have observed Koon with said cane during this face-to-face interaction. And for the same common-sense reasons explained above, we can further infer that Wells must have known Koon suffered from a mobility impairment. But even if we were unwilling to draw that inference, we could also reasonably infer that, given the timing and context of the conversation—shortly after Koon's grievance was denied and right before he sent Wells a letter regarding his situation—Koon simply told Wells that he was a disabled inmate with a climbing restriction during their discussion.

On June 26, Koon followed up on this conversation and wrote Wells a letter regarding his "inability to obtain a handicap pass." J.A. 80. Wells admitted receiving this

---

[16] Defendants do not contest the materiality of Wells's knowledge.

50

letter. Though the record is silent on the letter's specifics, it is again reasonable to infer that Koon told Wells what he seemingly told anyone with a pulse in the spring and summer of 2016: that he was an ADA inmate with a no-climbing restriction who still had no access to the first-floor library.

Finally, about a month later, Wells "careful[ly] review[ed]" Koon's grievance. J.A. 48. That grievance expressly noted that Koon was an "ADA inmate" who was unable to meaningfully access the regular library because it was located up two flights of stairs. J.A. 45. So, unless we are willing to assume that Wells closed his eyes and plugged his ears, he must have been aware of Koon's plight.

But that is more or less what the majority opinion suggests we should assume. It too acknowledges that "Wells met with Koon and that Koon told him about his issues with the handicap pass." Majority Op. at 21–22. But instead of inferring that this means Wells knew about Koon's problems accessing the library—an inference favorable to Koon—the majority weighs the evidence and finds that Wells likely disregarded Koon's spoken and written pleas and "assume[d] that [Browning's] denial meant a handicap pass was not medically necessary"—an inference favorable to Wells. *Id.* But in this posture we may not accept Wells's "self-serving assertions and read[] the record in the light most favorable to him, the party *moving* for summary judgment." *Knibbs*, 30 F.4th at 217. Doing so violates "the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the *nonmoving* party." *Tolan v. Cotton*, 572 U.S. 650, 660 (2014) (per curiam) (emphasis added).

51

Unless we are willing to shun this fundamental principle, we must conclude Wells's knowledge is genuinely disputed.

B.

That brings us to the third prong of the deliberate-indifference test. To establish this prong, a plaintiff must show that the defendant "fail[ed] *adequately* to respond." *Jennings*, 482 F.3d at 700 (emphasis added) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). A defendant's response is inadequate if they "fail[] to take reasonable measures to deal with the risk" of harm to the plaintiff. *Anderson v. Kingsley*, 877 F.3d 539, 546 (4th Cir. 2017).

While this is a forgiving standard, a "half-hearted investigation or remedial action will [not] suffice to shield a[n entity] from liability." *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016). That is especially true in this context, where it is "well-settled that [the ADA] and § 504 'create a duty to gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary.'"[17] *Updike v. Multnomah Cnty.*, 870 F.3d 939, 954 (9th Cir. 2017) (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).

---

[17] At times, the majority opinion seems to recognize this statutory duty to investigate a reasonable-accommodation request. *See* Majority Op. at 18 n.6 (noting that "a failure to investigate a known claim for reasonable accommodation could be deliberate indifference" but finding the State "did more than nothing"). But at other times, it faults Koon for stating in his pro se filings that Browning and Wells "should" have further investigated his request, noting this is "the language of negligence." *Id.* at 19. While Koon may have used inartful language in his pro se pleadings, complying with the ADA and § 504 is not optional. Prison officials *must* adequately investigate an inmate's reasonable-accommodation request. *Duvall*, 260 F.3d at 1139 (holding that pursuant to the ADA and § 504, public officials are (Continued)

52

Yet a half-hearted investigation appears to be all that Koon received from Browning and Wells. So, this element also cannot be resolved against Koon at summary judgment.

### 1.

To begin, Koon has clearly established at least two genuine and material disputes that go to Browning's failure to respond adequately.

### i.

First, there is a genuine dispute regarding Browning's purported reason for dismissing Koon's request for a handicap pass. In 2016, a staff investigator responding to Koon's grievance reported that Koon's request was "denied by the unit provider"—Browning—because it "was determined not to be *medically necessary*." J.A. 47 (emphasis added). This justification was later repeated in Defendants' answer to Koon's complaint, which explained that Koon's request "was reviewed by [Browning] who determined that [a] handicap card was *not medically necessary* and that [Koon] *could access the regular library*." J.A. 21–22 (emphases added). Fast forward to 2020, however, and Browning now asserts in an affidavit that she rejected Koon's request on *procedural* grounds because it appeared as a *renewal* request for a pass that had never been issued. However, as Koon notes, his sick-call appointment requests never reference a renewal, and Defendants never produced a computer record of this purported renewal request, so all we have to support

"*required* to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation" (emphasis added)). How else could they determine that an accommodation (or declining to provide such an accommodation) is reasonable?

53

Browning's revised explanation is her own self-serving statement, made four years after the fact.

The majority opinion adopts that self-serving explanation with little discussion. *See* Majority Op. at 6 ("When Koon's request for a handicap pass came across Browning's desk, it appeared in the computer system as a request for a *renewed* handicap pass."). In doing so, it forgets that "[i]n this procedural posture, we may not credit [Browning]'s evidence"—meaning "we may not take as true [her] assertion that" the request was filed as a renewal. *Hensley ex rel. N.C.*, 876 F.3d at 579. That seems especially prudent here, where Browning's post hoc assertion flies directly in the face of her previous contemporaneous explanation.[18]

If we apply the correct standard, we must conclude there is a genuine dispute concerning Browning's purported reason for rejecting Koon's request. Defendants' incoherent briefing on this point proves as much. *See* Response Br. at 6, 23, 26, 29 (first stating that Browning denied Koon's request as an improper "request for a renewed handicap pass," then claiming that Browning made a "purely medical decision[]" which "was based on [her] medical judgment," then switching back to say "Browning denied [Koon's] request because she received it as, and treated it as, a request for a *renewed*

---

[18] The majority opinion posits, without discussion, that there "isn't necessarily tension" between Browning's two justifications. Majority Op. at 20 n.9. I disagree. Browning's first justification is a *substantive* judgment about medical necessity. Her second explanation is based on a *procedural* hang-up (Koon or a nurse supposedly submitting an incorrect form) which has nothing to do with medical necessity. At any rate, I agree with the majority that at summary judgment, "we [can] assume these explanations *are* mutually exclusive." *Id.* (emphasis added).

54

handicap pass," before concluding that Wells relied on Browning's "medical advice"). So, the only remaining question is whether this dispute is material. It is.

If a reasonable juror discounted Browning's post hoc renewal explanation, they could rationally conclude that her medical-necessity explanation was a pretext and her response to Koon's plight was inadequate. As noted above, there is ample evidence to suggest that Browning knew Koon could not meaningfully access the regular library when she denied his request for a handicap pass. At the very least, she must have "strongly suspected" that was the case. *Farmer*, 511 U.S. at 843 n.8. But instead of taking steps to "verify [the] underlying facts" or "confirm inferences of risk that [s]he strongly suspected to exist," she simply denied Koon's request. *Id.* Then, when her superiors began to inquire about Koon, she told them a handicap pass "was not medically necessary and that [Koon] *could* access the regular library." J.A. 21–22 (emphasis added).

In effect, Browning knew or suspected there was an issue, failed to investigate that issue, then "tried to sweep the [matter] under the rug" by offering a pretextual explanation that she knew lacked evidentiary support. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 273 (4th Cir. 2021). Arguably, she then tried to cover up this cover up by offering yet *another* pretextual explanation—Koon's request was a renewal—without a shred of support in the record, apart from her own self-serving affidavit. That not only "rise[s] to [the level of] deliberate indifference," but arguably exceeds it. Majority Op. at 22.

55

ii.

Even if we treated Browning's amended explanation—that she rejected Koon's request as an improper renewal—as an undisputed fact (which again, it isn't), Koon has still created a genuine dispute regarding the adequacy of her response.[19]

If we take Browning at her (revised) word, she received Koon's request and noted it "was a request to _renew_ his handicap pass." J.A. 53. So, she "reviewed his medical records in [HERO]," saw there was "no previously ordered handicap pass," and summarily denied the request. J.A. 53. A few weeks later, she was asked to review Koon's MRI documentation from Central, but took no further action. Around this time, she was contacted by staff investigators and Warden Wells, and she apparently informed them that a "handicap card was not medically necessary and that [Koon] could access the regular library." J.A. 22.

That is a plainly inadequate response. As already established, a reasonable juror could conclude Browning knew about Koon's physical limitations. But apart from looking through Koon's medical records for a previously issued handicap pass, Browning conducted no additional investigation. She did not meet with Koon, speak with him, or conduct a medical evaluation to reevaluate the extent of his restrictions—even though she later told her superiors a pass was not medically necessary. Nor did she take any concrete action after reviewing Koon's MRI documentation, such as informing the staff investigator

---

[19] This dispute is material because it goes directly to one of the elements of deliberate indifference, and thus might influence the outcome of the case.

56

of Koon's meniscus injury[20] or telling Wells about the MRI during Koon's subsequent appeal. In fact, there is no evidence in the record that Browning took any further action regarding Koon's request at all.

The majority opinion counters that at least Browning "did more than nothing." Majority Op. at 18 n.6. Maybe so, but we have expressly rejected the notion that "only a complete failure to act can constitute deliberate indifference." *S.B. ex rel. A.L.*, 819 F.3d at 77. Because the test is whether the defendant "fail[ed] *adequately* to respond," *Jennings*, 482 F.3d at 700 (emphasis added), we have repeatedly held that a "half-hearted investigation or remedial action" can establish liability, *S.B. ex rel. A.L.*, 819 F.3d at 77.

For example, in *Doe v. Fairfax County School Board*, we concluded a reasonable jury could find a school deliberately indifferent to a student's sexual assault even though administrators took some steps to address the matter. 1 F.4th at 262, 272–73 (observing that school officials had interviewed the victim, the abuser, and two other witnesses, but that a jury could nevertheless conclude that officials had conducted those interviews in a biased manner; failed to follow up with "other students who were identified as potential sources of information"; tried to sweep negative reports "under the rug"; and "improperly trivialized and dismissed the reports of sexual assault," among other issues); *see also Cadena v. El Paso Cnty.*, 946 F.3d 717, 725 (5th Cir. 2020) (finding a genuine dispute of

---

[20] There was still time to do so. Browning reviewed Koon's documentation on July 16. But the staff investigator did not respond to Koon's grievance until July 21.

57

fact regarding prison officials' deliberate indifference where a plaintiff recovering from a broken leg requested a wheelchair multiple times but was provided crutches instead).

Browning's investigation in the present case is similarly deficient. Like the officials in *Doe*, Browning took some investigative steps, namely skimming through Koon's medical records and keeping tabs on his orthopedic referrals. But she failed to take any concrete steps toward resolving his actual complaint: that he could not meaningfully access the regular library due to his known and obvious disability. Instead, she denied his substantive statutory right to access the library on thin procedural grounds,[21] misinformed prison investigators that her determination was based on a lack of medical necessity, and neglected to take any action after she became aware that her earlier failure to accommodate Koon's disability contributed to a torn meniscus. *Doe*, 1 F.4th at 272–73. That is the definition of a "half-hearted investigation or remedial action" that is insufficient to shield an official from liability. *S.B. ex rel. A.L.*, 819 F.3d at 77.

2.

Koon has also established a genuine dispute regarding the adequacy of Wells's response. To recap, we know that Koon told Wells about his situation in a letter, in person,

---

[21] It is worth noting that neither Defendants nor the majority opinion point to any prison policy or practice stating that renewal requests must be rejected if no original handicap pass was issued. Even if there were such a policy, I am skeptical that it could be invoked to frustrate Koon's statutory rights. The ADA and the Rehabilitation Act do not care whether Koon allegedly submitted a mislabeled renewal request. These statutes only care whether Koon, as a disabled inmate, could meaningfully access the prison's services, such as the library. If he could not, then prison officials were *required* to reasonably accommodate his disability, procedural hang-ups notwithstanding.

58

and in his prison grievance. We either know (from the grievance letter) or can safely infer (from the letter and conversation) that these exchanges informed Wells about Koon's ADA status and no-climbing restriction, as well as his trouble accessing the library. We can further infer that if Wells saw Koon in person, he probably saw Koon with his cane, and must have drawn the obvious inference that Koon's disability was not only real but debilitating. We also know that in spite of all of this, Wells was later told by Browning and his staff investigator that a handicap pass was not medically necessary. So, Wells had a choice about whom to believe—the ADA-designated inmate with a prison-issued cane or his staff.

While a jury could certainly find Wells responded reasonably by choosing to discount Koon and rely solely on his staff's determinations, there is room for debate. If we draw all reasonable inferences in Koon's favor, Wells must have taken Koon at his word and believed or at least "strongly suspected" what his eyes told him to be true: Koon was indeed an ADA inmate with a no-climbing restriction. *Farmer*, 511 U.S. at 843 n.8. Wells must also have known that he had a statutory duty to reasonably accommodate prisoners just like Koon, as well as a duty "to gather sufficient information from the [disabled individual] and qualified experts as needed to determine" what response was appropriate. *Updike*, 870 F.3d at 954.

But instead of attempting to "verify [the] underlying facts" or confirm his strong suspicions, *Farmer*, 511 U.S. at 843 n.8, Wells hid behind his staff's flawed assessments and denied Koon relief in cursory fashion. In effect, he simply buried his "head[] in the sand." *Makdessi*, 789 F.3d at 133. That response was particularly inadequate given the

59

conflict between what Koon was telling and showing him and his staff's purportedly "medical" findings. Because a reasonable jury might conclude that Wells's response was inadequate, I would leave this matter for the jury.

## IV.

In the end, the majority opinion falls victim to an all-too-common temptation for appellate judges: it steps into the shoes of the factfinder. While stepping into that role may be tantalizing, on appeal, we cannot substitute our judgment for the jury's when there is a genuine dispute of material fact. And there is no shortage of genuinely disputed material facts in this case. By ignoring these disputes or uniformly resolving them in Defendants' favor, I reluctantly must conclude that the majority opinion has effectively "usurp[ed] the role of the factfinder" and aggrandized its own power in contravention of the Seventh Amendment. *Wilson v. Williams*, 997 F.2d 348, 350 (7th Cir. 1993). So, I must respectfully dissent.

60